Luis MARTINEZ et al.,
Plaintiffs-Appellants,

v.

F. David MATHEWS, Secretary of
Health, Education and Welfare, et
al., Defendants-Appellees.

No. 76–1794.

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1976.

Suanne Pierce, Michael R. Masinter, Homestead, Fla., for plaintiffs-appellants.

Sanford F. Dernis, Miami, Fla., for Rice, and others.

Lewis Polansky, Reg. Counsel, Dept. of HEW, Atlanta, Ga., John Steven Berk, Asst. U.S. Atty., Miami, Fla., Leland B. Ware, Atty., Dept. of HEW, Atlanta, Ga., for defendants-appellees.

Before BROWN, Chief Judge, TUTTLE and TJOFLAT, Circuit Judges:

TUTTLE, Circuit Judge:

This is an action asserting the failure of a provider of health services for migrant and seasonal farmworkers and their families to comply with the Migrant Health Act's requirement that individuals being served by the center comprise a majority of the provider's "governing board," 42 U.S.C.A. § 247d(f)(2)(G) (1976). Appellants, plaintiffs below, are migrant or seasonal farmworkers, or wives of such workers, and represent themselves and the class of those similarly situated. They filed suit on May 5, 1975 against Community Health of South Dade, Inc., (hereinafter CHI), which is a grantee of migrant health funds under section 247d.[1]

---

1. CHI's Executive Director, George Rice, is also a defendant. In addition, plaintiffs named as defendants the Secretary of the Department of Health, Education and Welfare, now David

It does not appear that board members have, at any time during this litigation, been selected under rules that required a majority to consist of representatives of migrant or seasonal farmworkers or members of their families, nor has CHI contended that its board possesses such a farmworker majority. Plaintiffs contend that CHI has violated the statute. CHI, however, argues variously that the governing board requirements have not been breached or are not yet applicable.

Our disposition of the case is complicated by the lengthy procedural course already run in the case, and by the narrow procedural setting of this appeal. Plaintiffs' original complaint sought declaratory and injunctive relief based both on the alleged noncompliance with the governing board requirement, and on allegations that CHI unlawfully used migrant funds for health care and administrative costs not attributable to eligible farmworkers or their families. Besides asking for an accounting, court costs, and attorneys' fees, plaintiffs urged the Court to order CHI both to establish the requisite permanent board and also to establish an interim board. On the day their complaint was filed, plaintiffs also moved for a preliminary injunction, which would have required immediate establishment of an interim board, and suggested a plan which would have required election of the farmworker members of this board in June 1975. On May 27, 1975, the lower court denied the preliminary injunction, but ordered the government defendants and CHI to "require that a policy board be established and the membership of that

board chosen no later than . . . November, 1975" in accordance with the then applicable HEW regulation. An Ad Hoc Task Force, set up earlier by the Comprehensive Health Planning Council of South Florida, Inc., worked to formulate a plan for the selection of a board complying with the migrant health regulations, 42 C.F.R. § 56.105 (1975) (deleted and new regulations substituted 41 Fed.Reg. 38889 (1976)). The Task Force and plaintiffs agreed that the peak of the migrant season is in January, and on July 16, 1975 all parties stipulated to an extension of the earlier order's deadline to January 1976.[2]

Then, on November 21, 1975, CHI filed a petition "for emergency relief and order staying election." A major ground for this motion was that CHI had only recently been informed by HEW that the 1975 amendments to the Public Health Service Act would now be applicable to it. (The new amendments, whose impact is discussed later in this opinion, altered the governing board requirements). Besides its apparent argument that the dictates of the new law were uncertain, CHI was disturbed by the possibility of multiple elections, and also restated its concern that all groups actually served by CHI be represented on its board. HEW joined in CHI's petition (though without concurring in the CHI "concern" just mentioned). Over plaintiffs' opposition, the court below granted the petition for emergency relief on January 9, 1976, declaring void any selection procedures followed pursuant to its earlier order. In its order, the court required the defendants to "effectuate a selection process" to be completed no

Mathews, and its Regional Health Director for Region IV, Herbert A. Hudgins. Although at oral argument HEW took a position on the law which is contrary to the plaintiffs', its counsel stated without contradiction, that no relief is presently sought from the Department.

2. The Task Force had evidently been set up with a similar function, prior to the filing of this lawsuit, in response to HEW's indication as early as April 1, 1975 that CHI must achieve a farmworker majority board. HEW also evidently acquired, and CHI on April 21, 1975 submitted, a letter of intent to develop a plan for selection of such a board. In addition,

HEW imposed a special condition on its 1975–76 grant to CHI. This condition required the submission of a plan to reconstitute the board in accordance with Migrant Health Program regulations. CHI complied with this requirement when, on July 17, 1975, it accepted (and later submitted) a plan almost identical to one approved by the Comprehensive Health Planning Council after consideration of recommendations by the Ad Hoc Task Force. This plan provided for a farmworker-majority board. (The Council's plan was changed in only one respect, to set the date of the election for January. The same change was made by the court, as noted in text.)

later than April 15, 1976, to obtain a policy board in compliance with the new amendments. The court also ordered the parties to confer and, with the advice of the HEW General Counsel, agree to a selection process. If unable to agree by February 9, 1976, the parties were instructed to seek from the court additional relief to assure compliance by April 15, 1976.

The next step was a February 11, 1976 motion filed jointly by plaintiffs and HEW, asking the court to order CHI to forthwith implement a proposed election plan. One day earlier, CHI's board had refused to accept a plan agreed to by plaintiffs and HEW. The trial court held a hearing on February 19, and on March 10 issued the order which plaintiffs challenge in this appeal. This order mandated the election of an "interim board . . . to serve on . . . CHI's Board of Directors until the annual election in November of 1976." Ten migratory and seasonal farmworkers were to be elected on April 4, 1976 and added to the then existing board. In issuing this order, the court chose a solution already embodied in by-laws adopted by CHI on February 10, pursuant to which the existing board (evidently consisting of sixteen members) was to be augmented with ten farmworkers (and seven "non-migratory and seasonal agricultural workers.") The farmworker election was held on April 4, 1976.[3]

Further complicating the procedural picture is the absence of any final judgment as yet. On December 31, 1975, CHI filed a motion for summary judgment. HEW filed its motion for summary judgment on January 5, 1976. The February 19 hearing, which dealt with the joint motion of plaintiffs and HEW for implementation of the election plan, was also to consider CHI's

motion for summary judgment. On February 23, 1976, plaintiffs also sought partial summary judgment, on the governing board issue. So far as the record reveals, no order has been issued on any of these motions for summary judgment.

## I. Jurisdiction and the Scope of Review

■ It is clear that the appeal before us is an interlocutory one. (Indeed, a trial date had been set for late November, but this date has since been cancelled and the case transferred to another district Judge). Our jurisdiction to hear the appeal is not thereby impaired,[4] for the lower court's March 10 order that an interim board be elected is properly appealable under 28 U.S.C.A. § 1292(a)(1) (1966). The order is not styled as injunctive relief, but in the classification of an order as an injunction, the essential effect and character of an order, rather than the terminology applied to it, are decisive. See McCoy v. Louisiana State Bd. of Educ., 345 F.2d 720, 721 (5th Cir. 1965) (per curiam); cf. 7B Moore's Federal Practice ch. 83, at JC–422 (2d ed. 1976). Whether characterized as a denial of a mandatory injunction (which would have ordered the election plaintiffs sought), or as a modification of a mandatory injunction effectively imposed by the court's previous order of January 9, 1976, this order is therefore appealable.

■ CHI asserts, however, that the appeal is moot. It is not contended, of course, that there is no active controversy between plaintiffs and CHI.[5] But when suit was filed, the applicable law was 42 U.S.C.A. § 247d (1974) and CHI argues that the provisions of the old law are without legal effect. On July 29, 1975, section 247d was thoroughly revised by Title IV, section

---

**3.** Under the by-laws, a new board was to be elected in November, 1976; on this thirty-four member board, migratory and seasonal agricultural workers would comprise "one member less than a percentage of the entire Board of Directors equivalent to the percentage of patient visits by [such] workers of the total patient visits of all CHI operated facilities." (By-laws, Art. IV § 1.(b) 1). CHI-compiled statistics indicate that this figure was approximately 32% from February 1974 to January 1975.

**4.** In an unpublished order, another panel of this Court denied CHI's motion to dismiss the appeal for lack of jurisdiction, and directed that the mootness question, *infra* be carried with the case.

**5.** That trial of the case is pending does not, of course, in itself make disposition of this case moot.

401(a) of the Special Health Revenue Sharing Act of 1975, Pub.L. No. 94–63, 89 Stat. 304, 334–41 (codified at 42 U.S.C.A. § 247d (1976)). Whatever the impact of this amendment upon grants for the fiscal year which began July 1, 1975, it is clear that grants for the present fiscal year must be governed by the new law. But the change in the applicable law does not moot the case. Rather, even when the events of a case transpire before such a change in the law, the rule is that if the new law takes effect in the course of a lawsuit, the action can be adjudicated according to the new provisions, unless to do so might produce "manifest injustice." *See Bradley v. School Bd. of Richmond*, 416 U.S. 696, 714–17, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 281–83, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Here, in any event, our decision need only apply to events—the continued use of migrant funds by CHI—occurring after the new law's enactment. Moreover, the record below indicates that as early as its order of January 9, 1976, the trial court viewed the new provisions as the relevant law (though its view may later have changed).

Our action in this case could be more seriously constrained by the fact that various aspects of plaintiffs' theories supporting entitlement under the new law apparently have not been previously presented to the lower court. It is frequently said that appellate courts should not consider issues raised for the first time on appeal. *See, e. g., Guerra v. Manchester Terminal Corp.*, 498 F.2d 641, 658 n. 4 (5th Cir. 1974). But even if this rule is pertinent here, it can give way when a pure question of law is involved and a refusal to consider it would result in a miscarriage of justice. *Evans v. Triple R Welding & Oil Field Maintenance Corp.*, 472 F.2d 713 (5th Cir. 1973). Plaintiffs here have now pursued their claim for an 18-month-period—time enough for migrants, dispersing from the South Dade

area when suit was filed, to return and leave again, and now to be converging once more on this region. If their rights in the governance of CHI have been violated, it is incumbent upon the courts to remedy this violation. The power of this Court to give such a remedy is limited by the fact that appellate inquiry into the merits of an interlocutory decision on injunction relief ordinarily seeks only to ascertain whether the lower court has abused its discretion, *see Di Giorgio v. Causey*, 488 F.2d 527 (5th Cir. 1973). But, if necessary, the court may also exercise a residual power "'to do what plainly ought to be done.'" *Mercury Motors Express, Inc. v. Brinke*, 475 F.2d 1086, 1091 (5th Cir. 1973), *quoting* 9 Moore's Federal Practice ¶ 110.25[1] (2d ed. 1972).

## II. The Merits

To determine whether, under the new statute, the plaintiffs are entitled to preliminary injunctive relief beyond what they have received, we must both ascertain what composition of a governing board would satisfy this law, if a board is required, and then decide whether any governing board is required at all. The basic provision for the board's composition is 42 U.S.C.A. § 247d(f)(2)(G)(i) (1976), which dictates that HEW "may not approve" a grant for the operation of a "migrant health center" (under 42 U.S.C.A. § 247d(d)(1)(A) (1976)) unless the center has established a governing board "composed of individuals a majority of whom are being served by the center and who, as a group, represent the individuals being served by the center." This provision is implemented by 42 C.F.R. § 56.304(b), 41 Fed.Reg. 38894 (1976), which requires a majority of the board to consist of "individuals who are or will be served by the center and who, as a group, represent the individuals being or to be served in terms of demographic factors, such as race, ethnicity, and sex."[6]

What these standards do not spell out is whether the individuals "who are or will be

---

**6.** We note that this standard is slightly stricter than that under the old regulations which required only that 51% of the board members "be chosen by a democratic process by the population to be served." 42 C.F.R. § 56.-105(a)(2) (1975) (deleted and new regulations substituted, 41 Fed.Reg. 38888 (1976)).

served by the center" can only be migrant and seasonal farmworkers and their families. It is clear that the funding provided by the United States under this statute can only be used to provide services to this group. *See* "Note" following 42 C.F.R. § 56.104(b)(11), 41 Fed.Reg. 38891 (1976). It is equally clear that a provider of health services to this group may provide services to others as well, presumably through the use of other funds. *See id.* § 56.105(b)(11).

Put precisely, therefore, the issue is whether such other persons are being served by "the center." The term "migrant health centers" is defined in 42 U.S.C.A. § 247d(a)(1) (1975) as "an entity which . . . provides . . . [various health services] for migratory agricultural workers, seasonal agricultural workers, and the members of the families of such . . workers, within the area it serves." While this language is consistent with the view that "centers" serve only farmworkers and their families, it, too, is less than explicit.

We turn, therefore, to the legislative history. The existence of a distinct migrant health program evidently dates back only to Pub.L. No. 87–692, 76 Stat. 592 (1962). The first explicit provision for community or client participation in the migrant health programs came in Pub.L. No. 91–209, 84 Stat. 52 (1970), a relatively vaguely worded mandate of participation by "persons broadly representative of all elements of the population to be served and others in the community knowledgeable about such needs." HEW implemented this provision in 42 C.F.R. § 56.105 (1975) (deleted and new regulations substituted, 41 Fed.Reg. 38888 (1976)), requiring projects (with certain exceptions) to establish Project Policy Boards at least 51% of whose members were to be chosen by the population to be served. Most recently, in Pub.L. No. 94–63, § 401(a), 89 Stat. 334–41, (codified at 42 U.S.C.A. § 247d (1976)), Congress explicitly provided for a governing board similar in composition to that prescribed in HEW's regulations under the earlier statute, *see* 42 U.S. C.A. § 247d(f)(2)(G) (1976).

This development suggests a growing Congressional concern to assure the recipients of migrant health services a voice in the provision of their health care. The same concern is revealed in the report of the Senate Labor and Public Welfare Committee, accompanying the bill which became the present law, which notes that the 1970 adoption of a participation provision followed "hearings which determined that there existed little if any opportunity for migrants to influence the content of policies and programs intended to improve their lot." S.Rep.No.94–29, 94th Cong., 1st Sess. 102 (1975), [1975], U.S.Code Cong. & Ad. News pp. 469, 565.

There is also evidence of a continuing effort by Congress to prevent health care for migrants from being "lost in the shuffle." Undoubtedly, much of Congress' concern, as CHI emphasizes, has been to constrict the discretion of the executive branch to modify the Congressional blueprints for health care provision. But the needs of migrants have received inadequate attention at all levels of government, and Congress was surely cognizant of this problem. Certain of the comments of Congressional committees reflect or are consistent with a concern for this broader danger. Thus, in H.R.Rep.No.91–711, 91st Cong., 2d Sess. (1969), [1970] U.S.Code Cong. & Ad.News pp. 2499, 2501, the House Interstate and Foreign Commerce Committee characterized migrant health legislation as seeking to held "States and communities [to] adapt their health care system to the migrant's unique situation and need." The Committee was encouraged by the "promising start" in the provision of migrant services, but it felt that "special programs for agricultural migrants must be continued at this point of potential maturation [of the projects] to assure that the migrants are not lost in the shuffle, as they have been in the past." *Id.* at 2502. The conference report on the 1970 bill, Conf.Rep.No.91–853, [1970] U.S.Code Cong. & Ad.News pp. 2504, 2505, is still more forthright in emphasizing the need for a separate migrant program because of the inadequate inclusion of migrants in State and local programs for the

general population. When Congress enacted Pub.L. No. 94–63, it resisted an Administration proposal to end specific statutory authority for migrant health centers. The Senate Labor and Public Welfare Committee justified this resistance because it enabled Congress to define in sufficient detail the programs it wanted funded, and also guarded against the possibility that "these already underserved and frequently forgotten Americans [the migrants] will once again be lost in the competition for funds for health services." S.Rep.No.94–29, 94th Cong., 1st Sess. 9 (1975), [1975] U.S.Code Cong. & Ad.News p. 476.

■ This attention to migrant needs is hardly inconsistent with a recognition that facilities which serve migrants may also serve others who need medical care. Section 247d(a)(1) in fact defines a "migrant health center" as "an entity which either through its staff and supporting resources or through contracts or cooperative arrangements with other public or private entities provides" various elements of health care for migrant and seasonal farmworkers and their families. But even if Congress actually views such sharing of facilities as optimal, as CHI argues, it does not follow that a policy board without a farmworker majority also has a Congressional imprimatur. Rather, Congress' concern for the migrant voice and its fear that migrants would again be lost in the shuffle suggest that courts should construe the statute, where possible, to ensure the fullest migrant representation.

CHI points out, however, that the governing board requirement of section 247d is almost identical to the provision for governing boards for "community health centers" under 42 U.S.C.A. § 254c(e)(2)(G) (1976), which was, like the migrant board section, enacted by Pub.L. No. 94–63, 89 Stat. 304. CHI could receive funds for the operation of both sorts of centers, and could therefore be required to establish two separate boards

unless the statute's requirements can be equated. But at present, CHI's community health funding appears not to be meant to support a full-blown center, and hence CHI is not subject to conflicting requirements. If the two statutes do not both apply, it can nevertheless be argued that their provisions, passed simultaneously, should be construed alike. The meaning of a requirement of representation for the people being served by the center depends, however, on which people are being served. Congress carefully provided, in 42 U.S.C.A. § 254c(a) (1976) that a community health center provides health services "for all residents of the area it serves." Legislative history also refers to the area-wide scope of community health center services and of their governing boards. See S.Rep.No.94–29, 94th Cong., 1st Sess. 120, 124 (1975), [1975] U.S. Code Cong. & Ad.News, pp. 582, 587. Since migrant health centers serve a narrower group,[7] the group to be accorded representation on the migrant center board is narrower as well.

The views of HEW, as the agency charged with administering the statute, are also entitled to weight. In response to the lower court's direction, on January 9, 1976, that the parties agree on a selection process with the advice of the HEW General Counsel, two memoranda were produced by Carol C. Conrad, an Attorney Advisor for the Public Health Division, and sent on for the court by Louis K. Polonsky, an Assistant Regional Attorney. These memoranda take the position that a majority of the board must be migratory and seasonal farmworkers and members of their families, since these groups constitute the population eligible to be served by a migrant health center. At oral argument, counsel for the government at least implicitly appeared to agree that CHI's present board did not satisfy the specifications for governing boards (although he also argued, see page 1241 of 544 F.2d infra, that CHI was not presently required to have a board).

---

7. Migrant centers undoubtedly can provide services which benefit a wider population. This spillover effect is particularly clear in the case of environmental health services, which migrant centers must provide, when appropriate, under 42 U.S.C.A. § 247d(a)(1)(D) (1976). But the general difference in the scope of migrant and community centers remains.

It is true that HEW's position on this question has changed over the years. A 1972 letter from one HEW official, and a 1975 affidavit from another, both point to a different attitude in the past. CHI finds further support for its position in certain 1973 "Guidelines" issued by HEW; plaintiffs contest CHI's interpretation of them. In any event, whatever significance should be attached to the earlier HEW stance is diminished by a paragraph of HEW's answer to plaintiffs' complaint, which implies that once apprised of the situation, the General Counsel indicated that the CHI board did not satisfy the regulations.

This strict reading of the farmworker-representation requirement could be called into question if its application were likely to severely impair the functioning of CHI. Were CHI required to operate its entire range of health services, most not going to farmworkers, under the sway of a farmworker-controlled policy board, the voice of other health care consumers might be muffled. But plaintiffs suggest, instead, a separate board, farmworker-dominated, overseeing only the expenditure of migrant funds. As noted earlier, 42 U.S.C.A. § 247d(a)(1) (1976) permits a "migrant health center" to provide health care "through contracts or cooperative arrangements with other public or private entities." The migrant funds, therefore, could be paid over to CHI in return for its provision of care pursuant to such an agreement. The migrant governing board would be the body responsible for negotiating the terms of this agreement.[8] It is not unlikely that the product of this structure will be a total health care system with greater emphasis on the service of distinctive migrant needs—perhaps even to the detriment of service to others. But any such change of policy seems to us to be the consequence of ensuring that migrants are not lost in the shuffle. While it is possible, of course, to posit various circumstances in which this division of responsibility could cause administrative complexity or awkwardness that Congress can hardly have sought, we are unwilling to predict problems of such severity before they arise.

Somewhat troublesome legal problems are generated, however, by resort to this system. 42 U.S.C.A. § 247d(f)(2)(G)(ii) (1976) requires that the governing board be a body that "establishes general policies for the center (including the selection of services to be provided by the center and a schedule of hours during which services will be provided), approves the center's annual budget, and approves the selection of a director for the center." It is not unreasonable to view the negotiation and approval of a contract as the performance of these tasks. Whether the additional demands of the regulations can be satisfied is less clear. Most problematic is 42 C.F.R. § 56.303(t)(4), 41 Fed.Reg. 38894 (1976), which bars centers from entering into such contractual arrangements for the provision of "primary health services" unless "alternative resources are reasonably available to provide such services in the event of termination of such arrangements." "Primary health services" appear to be the core of what a health care provider must supply. See 42 C.F.R. § 56.102(L), 41 Fed.Reg. 38890 (1976). It may well be that no health care provider, able to take CHI's place, now exists in the South Dade area. It seems fair to assume, however, that other medical and administrative personnel are available. While assembling them might well be difficult, such difficulties seem inherent in an area of medical practice whose funding is neither lavish nor of long standing. Admittedly, the regulation's mandate of an alternative provider when a "center" operates by contract does respond to real concerns. For if the migrant grant recipient has only one source for health care, the recipient's power to control that source's policies is necessarily diminished. As a result, too, the migrant center policy board would be less fully empowered to carry out its functions.

8. HEW's Carol Conrad, in a memo of February 4, 1976, outlines this organizational structure. Conrad indicates that a separate legal entity might be required as the recipient of the federal funds. Plaintiffs appear to feel that only a separate board, rather than a separate corporation, would be necessary.

Such concerns may well underlie the Congressional intent, discerned by Carol Conrad in one of the HEW memoranda solicited by the lower court, that funding preference be given to projects providing services themselves instead of by contract. *Cf.* 42 C.F.R. § 56.305(a)(5), 41 Fed.Reg. 38895 (1976) (factors in Secretary's evaluation of applicant's ability to provide services directly). But it would be strange if the potential diminution in migrant independence, either from the general necessity for compromise in contractual relations, or from the absence of an alternate provider, constituted a justification for the more severe diminution entailed in less-than-majority membership on the policy board.

■ It is our view, therefore, that if CHI is subject to the governing board requirement, then its board for the migrant center must have a farmworker majority. Under the statute prior to amendment, every project was obliged to create a board, unless it fell within one of the classes entitled to a delay before this requirement could be imposed, *see* 42 C.F.R. § 56.105(b) (1975) (deleted and new regulations substituted 41 Fed.Reg. 38888 (1976)). The new law, however, makes this governing board requirement applicable only to "migrant health centers," 42 U.S.C.A. § 247d(d)(1)(A) (1976), *id.* § 247d(f)(2)(G). HEW is also authorized to make grants for "the operation of . .

entities which intend to become migrant health centers,"—but which do not fulfill all the requirements for a "center," 42 U.S.C. § 247d(d)(1)(B) (1976). Such entities do not have to have governing boards if "the Secretary finds that meeting . . . [this requirement] is not feasible or practical at the time of grant award," 42 C.F.R. § 56.403(a), 41 Fed.Reg. 38895 (1976).[9]

It was the position of HEW at oral argument that since migrant health centers must have migrant-controlled boards, and CHI does not, CHI's grant could not have been a "center" grant. The after-the-fact quality of this argument is highlighted by the statement in plaintiffs' supplemental brief that a Regional Public Health Service representative had confirmed to plaintiffs' counsel that CHI had been funded as a center. Moreover, since even an entity must have a board unless meeting this requirement is found by the secretary to be infeasible, the absence of a board (given the apparent absence of an infeasibility findings as well) also casts doubt on CHI's status as an entity.[10] On the other hand, there is some suggestion that HEW viewed the entity provision as the avenue for continuing the funding of projects which did not satisfy the directives of the new statute; if so, then CHI might well have been seen as falling in this class. *Cf.* prefatory statement on continuation projects under

---

**9.** Entities may receive up to two grants, 42 U.S.C.A. § 247d(d)(1)(B) (1976) probably not to exceed one year in duration each, *see* S.Rep. No.94–29, *supra* at 109, 1975 U.S.Code Cong. & Ad.News p. 572.

The new statute also permits grants for the planning and development of centers, 42 U.S. C.A. § 247d(c)(1)(A) (1976), and for the operation of projects in areas where no more than 6,000 migrants reside for over two months, *id.* § 247d(d)(1)(C). The regulations do not expressly preclude treating CHI as the recipient of a planning and development grant. There is also limited support in the legislative history for a broad view of what agencies may receive such funds. *See* S.Rep.No.94–29, *supra* at 109, 1975 U.S.Code Cong. & Ad.News p. 572. But CHI itself does not appear to claim development status, and to accord the bulk of its operation such a status would be surprising given

that CHI first received migrant funds in 1971 and is now a relatively long-standing organization. *Cf.* 42 C.F.R. § 56.204(b), 41 Fed.Reg. 38893 (1976) (maximum of two planning grants to any project). CHI cannot be funded under section 247d(d)(1)(C), because the migrant population of its area is evidently too large.

**10.** The record does not reveal the date on which CHI's current grant was awarded. If the award preceded the promulgation of the regulations then presumably it need not be in compliance with them if retroactive applicability was not intended. In particular, the provision that an entity must have a governing board unless the secretary finds it infeasible—a provision not derived from any parallel provision of the statute—would not apply of its own force. But we would still consider the regulations as guides in our interpretation of the impact of the statute upon CHI.

community health provisions, 40 Fed.Reg. 59346–47 (1975).

Even if it is concluded that the Secretary tacitly decided both that CHI was an entity and that it could not feasibly set up a board, such findings would face substantive attack. First, plaintiffs contend that CHI is a "center" rather than an entity. They argue that CHI provides the "primary health services" required of centers by 42 U.S.C.A. § 247d(a)(1)(A) (1976). In one pleading below, CHI took the position that it was a center, but its position subsequently changed. The record on appeal includes an affidavit by Dr. Jerome Beloff, CHI's medical director, outlining other respects in which, he contends, CHI fails to provide the full set of services required for a migrant health center. He indicates that CHI does not provide the range of referral and payment for "supplemental health services" required by 42 U.S.C.A. § 247d(a)(1)(C) (1976), nor the environmental health services of subsection (D) of this same section, nor the infectious and parasitic disease screening and control of Subsection (E), nor, finally, the accident and pesticide exposure prevention programs of subsection (F). None of these services, however, with the apparent exception of referrals to supplemental health services, is required of centers except as may be "appropriate." Plaintiffs asserted at oral argument that in the absence of an affirmative HEW determination of appropriateness—which apparently has never been made—these services are therefore not mandated, and their absence does not show that CHI is only an "entity" rather than a center. But both regulations, 42 C.F.R. § 56.102(g)(2), 41 Fed.Reg. 38889 (1976) and legislative history, see S.Rep.No. 94–29, supra at 108, [1975] U.S.Code Cong. & Ad.News p. 571, impose some constraints on the Secretary's discretion to decide that a service is not appropriate. It is not clear from this record to what extent a finding that these services are not appropriate for a "center" with CHI's characteristics could be justified. Nor is it any more plausible to characterize HEW's grant to CHI as a grant to a center where only a limited range of services are "appropriate" than it is to view HEW's action as a grant to an entity where establishment of a governing board is "infeasible."

The second substantive problem with HEW's stance is more significant. Under the regulations, entities are only freed of the governing board requirement if the Secretary finds that meeting the requirement is not feasible or practical at the time of the grant award, 42 C.F.R. § 56.403(a), 41 Fed. Reg. 38895 (1976). If HEW has reached such a determination, it has evidently done so without formal findings. Ordinarily, review of the correctness of this decision would presumably require a district court scrutiny (and possible supplementation) of the administrative record in light of the "arbitrary and capricious" standard. See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). (Perhaps this course would also be required simply to determine whether findings were made at all). But such a view—and the remand to the agency for reconsideration which might be the relief ordered—would not be necessary if a finding of infeasibility could not be made as a matter of law. In the case before us, no form of infeasibility or impracticality can readily be imagined that could not have been substantially resolved in the year-and-a-half's time which has elapsed since this litigation began. In the procedural context in which we reach this issue, we need not decide that plaintiffs will undoubtedly prevail on the question of feasibility. It is clear to us, however, that the likelihood of their success on this issue and hence the likelihood that the governing board requirement, as construed supra, is applicable to CHI, is very great.

 In evaluating claims for preliminary relief, courts are bound by stringent standards. Appellate courts especially must not go beyond a very narrow scope of

review, for these preliminary decisions necessarily entail very delicate trial court balancing. *See Gray Line Motors Tours, Inc. v. City of New Orleans*, 498 F.2d 293, 295–96 (5th Cir. 1974). Mandatory preliminary relief, which goes well beyond simply maintaining the status quo *pendente lite*, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party, *Exhibitors Postal Exch., Inc. v. National Screen Serv. Corp.*, 441 F.2d 560, 561–62 (5th Cir. 1971) (*per curiam*) *Miami Beach Federal Savings & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958).

Underlying the grant of such relief must, of course, be an evaluation of the equitable considerations involved: the plaintiffs' likelihood of prevailing on the merits, the possibility of irreparable harm to the plaintiffs, the counterbalancing risk of harm to the defendants, and the public interest. *See Blackshear Residents Org. v. Romney*, 472 F.2d 1197, 1198 (5th Cir. 1973). Here, plaintiffs' likelihood of success on the merits seems to us to be great. The potential harm to the plaintiffs is also significant. After January, evidently, migrant farmworkers will again begin to leave the South Dade area, so that any board selection process ordered thereafter may less accurately represent the farmworker population. Admittedly, the migrant voice may still be adequately heard on a board selected some time later. But the evident Congressional desire for a consumer voice in health care embodies an apparent conclusion that this voice, when heard, can produce better health care for the consumer. Delay in the achievement of such health care is surely irreparable injury. Moreover, and perhaps of central significance, the wrongs of which

plaintiffs complain have now gone without remedy for an extended period; the duration of this injury multiplies its severity.

Yet it is also true that the potential harm to CHI from the grant of preliminary relief is comparable. If farmworkers are not entitled to a greater voice on the board, then when they receive it some other group will be improperly deprived of representation. Moreover, there is an inescapable administrative cost, both in the reorganization necessitated by a greater farmworker voice and in the greater complexity of structure which the creation of a separate migrant health project board would entail. Nevertheless, these consequences seem to flow inevitably from a decision on the merits for the plaintiffs. In the same way, the public interest is on balance served by an order granting plaintiffs their rights under this statute.

We, therefore, conclude that plaintiffs are entitled to a modification of the lower court's earlier order.[11] Without foreclosing a further modification of this preliminary relief after trial on the merits below, we hold that plaintiffs are entitled now to majority representation on a board with responsibility for administration of the migrant grant. This new board should be selected as soon as a plan for its selection is approved by the court below, and should assume its responsibilities as rapidly as possible in light of the administrative difficulties inherent in this restructuring. We do not decide whether this representation should be provided on a board responsible solely for the migrant fund, or on the overall CHI board. Nor do we decide whether the selection of these representatives should be by election or by some other method.[12] Rather, we leave these matters to the nego-

---

11. Because we hold plaintiffs equitably entitled to further relief, we need not reach the question of whether in this Circuit an injunction may be issued against a violation of federal law without regard to the balance of the equities. *See generally Sierra Club v. Coleman*, 405 F.Supp. 53 (D.D.C.1975).

12. 42 C.F.R. § 56.304(c), 41 Fed.Reg. 38894 (1976), requires the internal rules of the migrant health project to specify a process of selection which will produce a representative board, and makes this process subject to the approval of the Secretary.

tiations of the parties, and to the district court if the parties are unable to agree on a procedure.[13]

REVERSED and REMANDED with directions. The judgment of this Court will issue forthwith.

---

13. We note, however, that 42 C.F.R. § 56.-304(a), 41 Fed.Reg. 38894 (1976) does constrain the parties' choices in one respect, for it limits the maximum size of the board to 25 members, rather than the 33 apparently envisioned in the CHI bylaws partially followed by the order appealed from.