# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 24, 2017

Lyle W. Cayce
Clerk

————

No. 16-30875

————

JEFFERSON COMMUNITY HEALTH CARE CENTERS, INCORPORATED,

> Plaintiff - Appellee

v.

JEFFERSON PARISH GOVERNMENT; JEFFERSON PARISH COUNCIL; RICKY J. TEMPLET, personally and in his official capacity as District 1 Parish Council member; PAUL D. JOHNSTON, personally and in his official capacity as District 2 Parish Council member; MARK D. SPEARS, personally and in his official capacity as District 3 Parish Council member; E. BEN ZAHN, III, personally and in his official capacity as District 4 Parish Council member; JENNIFER VAN VRANCKEN, personally and in her official capacity as District 5 Parish Council member; CHRISTOPHER L. ROBERTS, personally and in his official capacity as At-Large Division A Parish Council member; CYNTHIA LEE-SHENG, personally and in her official capacity as Chairwoman and Councilwoman-at-Large Division B Parish Council,

> Defendants - Appellants

————

Appeal from the United States District Court
for the Eastern District of Louisiana

————

Before STEWART, Chief Judge, and SMITH and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

This appeal concerns a preliminary injunction in Jefferson Community Health Care Centers, Inc.'s (JCHCC) action against the Parish of Jefferson, Louisiana, the parish council, and its councilmembers in their official and

individual capacities (collectively referred to as the "Parish" unless otherwise noted). In the underlying action, JCHCC seeks to permanently enjoin the Parish from evicting it from two Parish-owned facilities in which JCHCC currently provides medical services to medically underserved populations. JCHCC claims that the Parish wishes to evict it solely because JCHCC did not allow one of the councilmembers to unlawfully influence JCHCC's affairs. The district court granted JCHCC's motion for a preliminary injunction, enjoining the Parish from evicting JCHCC but allowing it to terminate the injunction by establishing that the medical needs of the population currently served by the relevant JCHCC facilities would be met if JCHCC were evicted. The Parish appeals, challenging both the issuance of the injunction and, alternatively, its contents and scope. For the reasons that follow, we conclude that JCHCC has not established a substantial likelihood of success on the merits of the only claim that is properly before us. Accordingly, we reverse the district court's grant of the injunction.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

JCHCC is a non-profit entity that receives federal funding under section 330 of the Public Health Service Act, 42 U.S.C. § 254b, to serve residents in medically underserved communities, regardless of their ability to pay. In the aftermath of Hurricanes Katrina and Rita, the Parish decided to allow JCHCC to use facilities owned by the Parish to restore basic health services to an underserved area of the Parish. Thus, in August 2006, JCHCC and the Parish entered into a "Cooperative Endeavor Agreement" (CEA) that would provide

---

[1] We describe the facts of the case in accordance with the findings of the district court, which were not contested before us. These findings will not bind the district court at trial on the merits. *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012).

rent-free facilities to JCHCC in Marrero, Louisiana, for purposes of serving the medically underserved population there for a ten-year period ending on July 31, 2016. The CEA also stated that the "Lease shall be renewed under the same terms and conditions for an additional five year term, unless any of the parties notify the other parties in writing of its intent not to renew at least 60 days prior to the expiration of the term then in effect." In exchange for its occupancy of the Marrero facility, JCHCC pledged to provide a full range of primary care and clinical preventive services throughout Jefferson Parish.

JCHCC took possession of the Marrero facility on August 1, 2006, and renovated it for clinical purposes, investing nearly $1.5 million in federal grant funds. Subsequently, JCHCC and the Parish entered into a separate CEA that provided for JCHCC's free occupancy of a Parish-owned facility in River Ridge, Louisiana, on a month-by-month basis.

Between 2009 and 2012, a series of federal and state audits found widespread misconduct in JCHCC's management, including commingling and misappropriation of funds, improper lending to employees, and overpayments to contractors. In the wake of the audits, JCHCC's then-CEO resigned, and the former CFO pleaded guilty to embezzlement. JCHCC nearly lost its federal funding, and the Health Resources and Service Administration (HRSA) of the Department of Health and Human Services imposed a corrective action plan that, among other things, required JCHCC to seek recoupment of the previously misspent funds.

In September 2012, Dr. Shondra Williams began serving as JCHCC's CEO. Williams spearheaded JCHCC's effort to implement a corrective action plan, as required by HRSA as a condition for its continued receipt of federal funding. Williams sent demand letters to individuals identified in audit reports as having received payments to which they were not entitled, including

No. 16-30875

JCHCC's former CEO and its former attorney. Soon after sending the demand letters, Williams received a fax message from the office of Parish Councilman Spears with a proposed resolution to terminate the Marrero CEA. Williams perceived the message as a threat precipitated by JCHCC's corrective action plan.

Williams subsequently met with Spears, at which meeting the councilman expressed to Williams that no one from JCHCC had reached out to him in the eleven months since he took office and commented that several entities were interested in occupying the Marrero space. Williams alleges that Spears then requested that she appoint an acquaintance of his to the governing board and terminate the CFO, who had participated in an audit that resulted in negative findings. On another occasion, Spears suggested that JCHCC should hire an attorney of his recommendation. Spears then told Williams that he would be interested in modifying JCHCC's CEAs to allow continued use of the Marrero facility only if JCHCC satisfied his requests.

In April 2015, Williams became aware that Councilman Spears attempted to persuade several JCHCC board members to terminate her employment as JCHCC's CEO without providing a reason. One year later, on April 5, 2016, JCHCC's former CEO sent Williams a demand letter requesting $184,000 in severance pay, but JCHCC denied this demand after reviewing it. Shortly afterward, JCHCC received a letter dated April 14, 2016 from the Office of the Parish Attorney, indicating that the Parish desired alternative lease terms and attaching two resolutions that would, respectively, terminate the Marrero CEA and replace it with a month-to-month arrangement.[2] The

---

[2] As previously noted, the Marrero Agreement was otherwise set to renew automatically for a five-year term after July 31, 2016.

4

proposed resolutions were included on the Jefferson Parish Council's agenda for April 20, 2016, but the vote was eventually deferred until May 11, 2016.

On May 11, without having previously provided any notice that such a resolution would be considered and without any discussion, the Parish Council voted unanimously to terminate the CEA for JCHCC's River Ridge facility. The council then also unanimously voted to terminate the Marrero Agreement as of July 31, 2016. The Parish subsequently adopted a resolution to authorize the Parish Clerk to advertise for submissions of Statements of Qualifications from prospective healthcare providers to offer full-time comprehensive medical care to uninsured individuals at the River Ridge and Marrero locations. JCHCC partnered with Ochsner Health System, which submitted a Statement of Qualification, with JCHCC as its subcontractor. No other submissions were received by the notice's June 30 submission deadline, and thus Councilman Spears unilaterally extended the deadline until July 14, 2016, and again to August 4.

On July 18, 2016, JCHCC filed this suit and a motion for a preliminary injunction against the Parish, the Parish Council, and the councilmembers in their official and individual capacities. JCHCC asserted claims under 42 U.S.C. § 1983 for violations of the Medicaid Act, 42 U.S.C. § 1396a(a)(10), and under section 330 of the Public Health Service Act, § 254b. In its response to JCHCC's motion for a preliminary injunction, the Parish did not address or even mention JCHCC's allegations under §§ 1983 or 254b and instead treated the matter as a simple breach of contract claim.

The district court held a hearing on the motion and, on July 26, granted a preliminary injunction enjoining the Parish from evicting JCHCC from the Marrero and River Ridge facilities but allowing the Parish to terminate the injunction upon a showing that the medical needs of JCHCC's Medicaid

patients would be met if JCHCC were evicted.  The Parish filed a timely notice of appeal on the next day.  Ultimately, after it filed its notice of appeal, JCHCC filed a first amended complaint, adding two Medicaid-beneficiary patients as plaintiffs and adding multiple causes of action.

## II. DISCUSSION

### A. Subject Matter Jurisdiction

As an initial matter, the Parish argues that JCHCC's federal claims are "so completely devoid of merit" that the district court did not have subject matter jurisdiction to allow it to grant a preliminary injunction.  While JCHCC points out that the Parish did not make this contention below, "we must satisfy ourselves that that the district court had jurisdiction to decide the case," regardless of whether the issue was raised below.  *See Passmore v. Baylor Health Care Sys.*, 823 F.3d 292, 295 (5th Cir. 2016) (citing *Union Planters Bank Nat'l Ass'n v. Salih*, 369 F.3d 457, 460 (5th Cir. 2004)).

"Questions of subject-matter jurisdiction are reviewed de novo." *Houston Ref., L.P. v. United Steel, Paper & Forestry, Rubber, Mfg.*, 765 F.3d 396, 400 (5th Cir. 2014).  "[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).  Thus, a district court lacks jurisdiction over a federal claim only if that claim "'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'" *Id.* (quoting *Bell v. Hood*, 327 U.S. 678, 682 (1946)).  Determining whether a claim is wholly insubstantial and frivolous necessarily entails consideration of the merits, *see, e.g.*, *Stem v. Gomez*, 813 F.3d 205, 209-10 (5th Cir. 2016); *Gilbert v. Donahoe*, 751 F.3d 303, 311 (5th Cir. 2013); therefore, we proceed to discuss the merits of JCHCC's claim for a preliminary injunction.  At this juncture, it suffices to say that,

although we ultimately conclude that JCHCC has not carried its burden to establish a substantial likelihood of success on the merits of the only claim that is properly before us, we do not view its claim for a preliminary injunction as "wholly insubstantial and frivolous" so as to deprive the federal courts of jurisdiction to consider it.

## B. *Burford* Abstention

Next, the Parish argues that, even if the district court had jurisdiction to consider JCHCC's claims, it should have abstained from exercising its jurisdiction because "the grant of relief to JCHCC violates the balance of powers between the federal government and local government and impedes the Parish Council's ability to regulate matters of local public concern." In this respect, the Parish highlights that state law governs its CEAs with JCHCC, and it claims that the Parish's termination of the CEAs was "subject to the Parish's local interests in providing effective government to its citizenry."

The Parish further contends that "the Medicaid Act established a cooperative state-federal program wherein the states actually administer and oversee the implementation of Medicaid assistance" and thus that "[h]ow Louisiana implements its Medicaid program and whether the Parish is in violation of the State's Medicaid program . . . necessarily involve important state interests." Finally, the Parish argues that the district court's exercise of jurisdiction "intrudes into the Parish's ability to govern and to enforce its contractual rights" and "opens the floodgates for dissatisfied Parish contractors who receive federal funding to file federal lawsuits seeking to enjoin the Parish from amending or terminating those contracts."

The Parish does not expressly commit itself to any particular abstention doctrine, but the only case it cites to actually support its argument deals with abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Although the

Parish did not raise this issue below, "*Burford* abstention may be raised at any time." *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 588 (5th Cir. 1998).

"The federal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given them." *Aransas Project v. Shaw*, 775 F.3d 641, 649 (5th Cir. 2014) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Nevertheless, under *Burford*, abstention is proper "where the issues 'so clearly involve basic problems of [State] policy' that the federal courts should avoid entanglement." *Id.* at 649 (alteration in original) (quoting *Burford*, 319 U.S. at 332). Thus, the Supreme Court explained:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989).

In deciding whether to exercise *Burford* abstention, we weigh the following factors:

> (1) whether the cause of action arises under federal or state law; (2) whether the case requires inquiry into unsettled issues of state law, or into local facts; (3) the importance of the state interest involved; (4) the state's need for a coherent policy in that area; and (5) the presence of a special state forum for judicial review.

*Romano v. Greenstein*, 721 F.3d 373, 380 (5th Cir. 2013). In *Romano*, a Medicaid beneficiary sued the Louisiana Department of Health and Hospitals under § 1983, alleging that its decisions, policies, and procedures resulted in

an illegal termination of her benefits. *Id.* at 374-75. Applying the factors described above, the *Romano* court stated:

> None of these factors weighs in favor of abstention in this case. The cause of action arises under federal law, there are no apparent issues of state law or local facts, the interest in proper application of federal Medicaid law is paramount, and there is no special state forum for judicial review. Accordingly, the district court did not abuse its discretion in declining to exercise *Burford* abstention.

*Id.* at 380.

This statement applies with equal force in the instant case: JCHCC asserts claims under federal law, and the Parish provides no meaningful support for its contention that the federal courts should abstain from deciding those claims. The Parish cites a single case, *Bethpage Lutheran Service, Inc. v. Weicker*, 965 F.2d 1239 (2d Cir. 1992), which is plainly distinguishable. In *Bethpage*, a provider of residential and day care services to disabled persons sued state officials, contending they were paying for services at a lower level than mandated by federal law. 965 F.2d at 1240. The Second Circuit ruled that *Burford* abstention was proper because there was a specific state regulatory procedure to challenge the service rates. *Id.* at 1244-45. Notably, the plaintiff's claims in *Bethpage* raised the specific question of what constitutes reasonable payment for necessary services under the Home and Community Based Services Waiver Act, which the court found "necessarily invokes the expertise and best judgment of the [state's] Commissioner of Mental Retardation and does not lend itself to consistent judicial interpretation." *Id.* at 1243.

In contrast, here, beyond making gestures at the importance of local interests, the Parish does not explain what efforts to establish a coherent policy on a matter of public concern would be disrupted by the exercise of federal

No. 16-30875

review.  *Cf. BT Inv. Managers, Inc. v. Lewis*, 559 F.2d 950, 955 (5th Cir. 1977) (reversing dismissal on *Burford* abstention grounds because "[a]lthough the challenged statutes [we]re part of a large and perhaps complex regulatory scheme[,] i. e., the Florida Banking Code[,] . . . appellants focus[ed] their attack upon a single statute whose possible invalidation could scarcely be expected to disrupt Florida's entire system of banking regulation" (footnote omitted)).  Nor does the Parish point to any difficult question of state law or a "special state forum for judicial review" that exists in this case.  *See New Orleans Pub. Serv.*, 491 U.S. at 361.  Accordingly, *Burford*-abstention is inappropriate in this case.

## C. Legislative Immunity and Privilege

The Parish contends that JCHCC's claims are all barred by legislative immunity and privilege.  The Parish reasons that JCHCC's claims are based on the motivations and thought processes of the councilmembers who enacted the resolutions at issue.  It contends that the Parish councilmembers' votes for the resolutions were "inherently legislative acts" and thus that they are immune from liability for their votes and their reasons for passing the resolutions are privileged.  JCHCC responds that it is seeking only equitable relief, and it argues that the Parish's termination of the CEAs was not a legislative act and did not trigger legislative immunity.

We need not consider, however, whether the councilmembers challenged actions in this case are subject to their legislative immunity in their individual capacity.  JCHCC has also sued the Parish, the Parish Council, and the councilmembers in their official capacity.  Local governing bodies, such as the Parish and its council, "do not enjoy immunity from suit . . . under § 1983," *Burge v. Parish of St. Tammany,* 187 F.3d 452, 466 (5th Cir.1999), and "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity," *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009)

10

(quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).  Thus, the Parish, the council, and the councilmembers in their official capacity enjoy no immunity from suit, and the action against those parties can serve as sufficient grounds to sustain a preliminary injunction.

Turning to the Parish councilmembers' claim for legislative privilege, we note that this is an evidentiary privilege, "governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence." *Perez v. Perry*, No. SA-11-CV-360-OLG-JES, 2014 WL 106927, at *1 (W.D. Tex. Jan. 8, 2014) (citing *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 93-94 (S.D.N.Y.2003)).  "While the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, at best, one which is qualified." *Id.* at *2 (citation and internal quotation marks omitted).  This privilege "must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth."  *Id.* at *1 (internal quotation marks omitted).  At any rate, even assuming that the councilmembers' reasons for passing the resolutions are privileged in the sense that they cannot be directly compelled to disclose them, this evidentiary privilege cannot bar the adjudication of a claim.

**D. The Preliminary Injunction**

The district court granted a preliminary injunction based on JCHCC's § 1983 Medicaid violation claim.  This court reviews a district court's ultimate decision to grant a preliminary injunction for abuse of discretion, but the district court's findings of fact are reviewed for clear error and its conclusions of law are reviewed de novo.  *See Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 267 (5th Cir. 2012).  To obtain a preliminary injunction, a movant

must establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs the injury to the party to be enjoined; and (4) that granting the injunction will not disserve the public interest. *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 196 (5th Cir. 2003). Our review ends with the first prong of this test, as neither of the two JCHCC claims that is properly before us survives it.

A. Section 1983 – Medicaid violation

JCHCC argues that the Parish's termination of the CEAs violated the rights of Medicaid-beneficiary patients of JCHCC's Marrero and River Ridge sites to receive services under the Medicaid Act, 42 U.S.C. §§ 1396a(a)(10) and 1396d(a)(2)(C). The district court opined that JCHCC's arguments "may stretch the limits of § 1983 relief" but concluded that it had made some showing of a substantial likelihood of success on the merits of a claim that "the Parish may not leave buildings vacant and deprive Medicaid recipients of their right to have accessible medical services." On appeal, the Parish argues that the district court erred in so concluding and that JCHCC had failed to establish that Medicaid beneficiaries have a right to obtain healthcare services on particular premises owned by the Parish.[3]

The Medicaid Act, § 1396 et seq., provides for the allocation of federal funds to states who submit a "State plan for medical assistance." § 1396-1. "States are not required to participate in Medicaid, but all of them do." *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).

---

[3] The Parish does not question JCHCC's standing to assert the rights of its Medicaid-beneficiary patients, and any such argument is therefore forfeited. *See Ensley v. Cody Res., Inc.*, 171 F.3d 315, 320 (5th Cir. 1999) (the limitation on third party standing is prudential and subject to forfeiture).

Section 1396a(a)(10) provides that "[a] State Plan must provide for making medical assistance available, including at least the care and services listed in paragraphs (1) through (5) . . . of section 1396d(a) of this title, to all individuals" who meet certain eligibility criteria. We have held that § 1396a(a)(10) creates a private right of action that is enforceable through § 1983. *See S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 605-07 (5th Cir. 2004).[4]

Pursuant to § 1396d(a)(2)(C), the services required under § 1396a(a)(10) include the services provided by JCHCC at its River Ridge and Marrero facilities. Until recently, the Medicaid Act defined the term "medical assistance" merely as "payment of part or all of the cost of services." § 1396d(a) (2009). However, Congress amended this definition through the Patient Protection and Affordable Care Act, and the term "medical assistance" is now defined as payment of part or all of the cost of the following care and services *or the care and services themselves, or both*." § 1386d(a) (2013) (emphasis added). The Seventh Circuit recently remarked that by amending this definition, "Congress intended to clarify that where the Medicaid Act refers to the provision of services, a participating State is required to provide (or ensure the provision of) services, not merely to pay for them." *O.B. v. Norwood*, 838 F.3d 837, 843 (7th Cir. 2016) (quoting *A.H.R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *11–12 (W.D. Wash. Jan. 7, 2016)).

The problem with JCHCC's theory that the Parish's termination of the CEAs would violate the Medicaid Act is that the Parish is not a state. While Louisiana is a participating state that may be required to provide or ensure

---

[4] In *Dickson*, we affirmed the district court's grant of summary judgment against the Louisiana Department of Health and Hospitals on a claim that the agency failed to provide Medicaid beneficiaries with medical assistance for prescribed disposable incontinence underwear. 391 F.3d at 603, 607.

the availability of medical services to eligible individuals under the Medicaid Act, the plain terms of the Medicaid Act impose no such obligation on the Parish. JCHCC does not point to any authority suggesting that every local government in every participating state must provide the relevant medical services, nor does it point to authority establishing that the Parish has any obligation under Louisiana state law to provide such services on behalf of the state.

Though there is no particular degree of likelihood of success that is required in every case, the party seeking a preliminary injunction must establish at least some likelihood of success on the merits before the court may proceed to assess the remaining requirements. *See State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). On the showing made, JCHCC's theory is unsustainable. It has not established a substantial likelihood of success on the merits of its claim.

B. Preemption under Section 330 of the Public Health Services Act

JCHCC alleges that the Parish's resolutions are preempted by Section 330 of the Public Health Services Act, § 254b, and its implementing regulations. Section 330 makes federal funding available to qualified health centers that provide primary healthcare services to medically underserved populations, and it imposes certain obligation upon such healthcare providers. *See* § 254b. JCHCC argues that the Parish's resolutions unlawfully obstruct JCHCC's ability to fulfill its Section 330 obligations and are therefore preempted by it.

Before the district court, JCHCC contended that it has an implied right of action under Section 330. The district court concluded that JCHCC had not established a substantial likelihood of success on the merits of this claim, primarily because it had not established that it had an implied right of action.

The court appeared to have misinterpreted JCHCC's argument as a contention that the Supremacy Clause creates an implied cause of action. Rejecting such a contention, the district court cited *Armstrong v. Exceptional Child Center, Inc.*, in which the Supreme Court held that "the Supremacy Clause is not the source of any federal rights[ ] and certainly does not create a cause of action." 135 S. Ct. 1378, 1383 (2015) (citation and internal quotation marks omitted).

On appeal, JCHCC no longer asserts an implied right of action under section 330, nor does it assert an implied right of action under the Supremacy Clause; instead, it appeals to the power of federal courts of equity to enjoin unlawful actions by public officers. *See Armstrong*, 135 S. Ct. at 1384 ("[I]n a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." (quoting *Carroll v. Safford*, 3 How. 441, 463 (1845)). We decline to entertain this request, as JCHCC did not raise it before the district court. *See In re Paige*, 610 F.3d 865, 871 (5th Cir. 2010) (this court generally does not consider arguments raised for the first time on appeal). We also do not reach the issue of whether the statute itself implies a private right of action, as JCHCC has forfeited this contention on appeal. *See United States v. Jackson*, 426 F.3d 301, 304 n.2 (5th Cir. 2005) (issue not raised in party's opening brief is generally forfeited). Accordingly, we cannot find any error in the district court's conclusion that JCHCC did not establish a substantial likelihood of success on the merits of its claim under section 330 of the Medicaid Act.[5]

---

[5] We note that, to the extent otherwise permissible, our opinion does not prevent JCHCC from raising its arguments regarding section 330's creation of a right of action and the courts' equitable power to enjoin unlawful action before the district court.

C. New Claims Asserted in JCHCC's First Amended Complaint

On August 12, 2016, after the district court issued its injunction, JCHCC filed a first amended complaint, which introduced new claims, including a breach of contract claim, a substantive due process claim, and an additional § 1983 claim asserting violations of JCHCC's right to payment under § 1396a(bb).   JCHCC contends that we "should not review the injunction through the lens of the original complaint only" and thus that we should consider the claims introduced in its first amended complaint.  We must reject this invitation.

We have refused to consider claims that were included in an amended complaint filed subsequent to a district court order in an appeal of that order. *See*, *e.g.*, *Charles v. Grief*, 522 F.3d 508, 510 n.1 (5th Cir. 2008).   More specifically, in the context of preliminary injunctions, we have said that "appellate inquiry into the merits of an interlocutory decision on injunction relief ordinarily seeks only to ascertain whether the lower court has abused its discretion." *Martinez v. Mathews*, 544 F.2d 1233, 1237 (5th Cir. 1976) (internal quotation marks omitted).  Here, there could be no abuse of discretion by the district court in denying relief based on claims that the court did not have before it.  We therefore decline to consider JCHCC's new claims as support for the district court's injunction.  *See id*.  Of course, JCHCC may raise these claims before the district court in the first instance in a motion for a new preliminary injunction.

## III. CONCLUSION

For the forgoing reasons, we REVERSE the district court's grant of a preliminary injunction.