United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 14, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-31442

_____

LAKE CHARLES DIESEL, INC.

Plaintiff-Appellee,

versus

GENERAL MOTORS CORP.; ET AL,

Defendants,

GENERAL MOTORS CORP.,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Louisiana

_____

Before JONES, WIENER, and DeMOSS, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant General Motors Corp. ("GM"), through its

aftermarket automotive parts division, AC Delco ("Delco"), appeals

from the district court's grant of a preliminary injunction to

Plaintiff-Appellee Lake Charles Diesel, Inc. ("LCD"), preventing

Delco from terminating its "ACDELCO Direct Account Supply Agreement

("Parts Agreement") with LCD. Delco contends, among other things, that the district court erred when it concluded that LCD had a substantial likelihood of success on the merits of its contention that Delco's putative termination of the Parts Agreement pursuant to the termination provision of that contract was invalid because it contravened applicable Louisiana law. Delco asserts that the court mistakenly concluded that the termination provision of the Parts Agreement is contravened — and thus trumped — by the termination provision of Louisiana's Repurchase of Farm, Industrial, and Lawn and Garden Equipment by Wholesaler Act ("Repurchase Act").[1] This statute specifies that a contract to which it applies cannot be terminated by a party in Delco's position except for good cause after furnishing 90 days prior written notice to a party in LCD's position, and giving such party the opportunity to cure the cause. Delco argues further that, even if, as a general proposition, a termination provision like the one in the Parts Agreement would be trumped by the mandated termination provision of the Louisiana statute, the contract's termination provision is not barred in this particular case. This is so, insists Delco, because the Parts Agreement is not a contract to which the Repurchase Act applies. For the reasons expressed in the

---

[1] La. Rev. Stat. Ann. 51:481-490 et seq. (West 2003).

remainder of the opinion, we agree with Delco that the Parts Agreement is not a contract to which the Repurchase Act applies.

Absent such applicability, Delco's termination in compliance with the contract could not be invalidated by a provision in the Repurchase Act that is "contravened" by the provision of the contract. This, in turn eliminates LCD's likelihood of success on the merits and makes the district court's grant of the instant preliminary injunction improvident. We therefore reverse the district court's grant of the preliminary injunction and remand with instructions to vacate that injunction and to conduct any further proceedings in a manner consistent with this opinion.

## I. Facts and Proceedings

Delco is a national supplier of automotive repair parts which it markets through a nationwide network of warehouse distributors. LCD has been a dealer in Delco automotive parts since 1977.

The instant controversy arose when Delco purported to terminate the Parts Agreement by having a letter hand-delivered to LCD, notifying it that Delco was terminating that contract effective 30 days after delivery. At the time, Delco and LCD were operating under the most recent version of their Parts Agreement, which had been extended for an indefinite term by a letter mailed less than two months prior to the delivery of the termination notice. That extension letter was from Delco's general manager and

3

included the statement that "[w]e intend to operate under this extension until we execute new supply agreements with our warehouse distributors, which will coincide with the implementation of the Dedicated Distribution Group. Required standards and guidelines must be achieved to enter into a new Dedicated Distribution Group agreement." Nevertheless, within a matter of weeks, Delco's regional manager personally delivered the 30-day termination notice to LCD. That notice did not state or imply that the relationship was being terminated for cause; neither did it offer any explanation for Delco's decision to terminate the Parts Agreement.

The Parts Agreement consists of a two-page document entitled "General Motors Corporation, SERVICE PARTS OPERATIONS ACDelco Direct Account Supply Agreement" appended to a copy of Delco's 14-page standard form dealership agreement. In the two-page instrument, LCD is named as the "direct account" and is authorized to sell each checked-off product line from among a list of 57 — in this case, 53 of the 57 listed product lines. One of the four product lines not checked off is "Engines." Among the 53 authorized product lines are a number that clearly are automotive parts but just as clearly are not engine parts: radiators, shocks, batteries, Durastop brakes, air conditioning, brake parts, steering and drive systems, transmission parts, and lighting. In Delco's mission statement at the top of page 4 of its 14-page standard form

4

instrument, the product lines covered by the Parts Agreement are referred to globally as "vehicle replacement parts."

LCD's business operations include, without limitation, the repair and rebuilding of engines of numerous manufacturers. LCD uses some of these Delco automotive parts in repairing and rebuilding engines and other equipment, and sells some of the stocked parts to third parties. The engine repair and rebuilding aspect of LCD's business, as well as the parts sales and distribution aspect, have a substantial (but not exclusive) connection with several significant Southwest Louisiana industries, such as marine, agriculture, construction, and the like.

LCD is not in the business of selling, distributing or retailing any new equipment, engines, implements, machinery, or attachments that are wholesaled, manufactured or distributed by Delco or GM. Rather, vis-à-vis GM and Delco, LCD maintains only a stock of Delco's vehicle replacement parts, which it either uses itself or sells, distributes, or retails to third parties.[2]

Shortly after receiving Delco's termination notice, LCD filed this suit in state court. In addition to Delco, LCD named another Louisiana distributor of Delco automotive parts as a co-defendant. Delco removed the case to the district court, asserting fraudulent

---

[2] At oral argument, counsel for LCD advised that the only new engines marketed by LCD are Volvo's.

joinder of the Louisiana defendant, and the district court denied LCD's subsequent motion to remand.

In its injunction suit, LCD complained that Delco's termination of the Parts Agreement violated both the Repurchase Act and Louisiana's Used Motor Vehicle Dealers and Marine Products Dealers Act[3] ("Marine Act"). In regard to the latter statute, LCD alleged that some of the engines it repairs and rebuilds, and some of the Delco parts it distributes, are used in the marine industry.

In its petition, LCD also complained that, by engaging in misleading and disingenuous correspondence in the weeks preceding delivery of its notice of termination, Delco breached an applicable Michigan law that proscribes violations of express covenants of good faith and fair dealing. In support of this charge, LCD pointed to the parties' mutual covenant in the Parts Agreement to communicate with each other in an "honest, ethical and professional manner."

The district court rejected as inapplicable LCD's attempt to invoke the Marine Act; and the court mused without ruling that LCD might well prevail on its claim that Delco breached the Parts Agreement by violating its honest-communication covenant. In the end, however, the court concluded that the Repurchase Act does apply to the Parts Agreement, and that the termination provision of

---

[3] La. Rev. Stat. Ann. § 32:771 et seq. (West 2003).

6

that statute governs, because the termination provision of the Parts Agreement does not merely differ from that of the Repurchase Act but directly <u>contravenes</u> it. As Delco's 30-day, no-cause termination notice failed to satisfy the applicable 90-day, good-cause termination provision of the Repurchase Act, reasoned the court, LCD met the likelihood-of-success prong of the temporary injunction test. After addressing the three remaining prongs of that test and concluding that LCD met them all, the district court granted the preliminary injunction that prohibits Delco from terminating the Parts Agreement. Delco timely filed a notice of appeal.

## II. <u>Analysis</u>

### A. **<u>Standard of Review</u>**

We have jurisdiction to review grants of preliminary injunctions under 22 U.S.C. § 1292(a)(1). We review such grants for abuse of discretion.[4] Even though "the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed <u>de</u> <u>novo</u>."[5]

---

[4] <u>Mississippi Power & Light Co. v. United Gas Pipeline Co.</u>, 760 F.2d 618, 621 (5th Cir. 1985).

[5] <u>Women's Med. Ctr. v. Bell</u>, 248 F.3d 411, 419 (5th Cir. 2001).

**B.    Requirements for Preliminary Injunction**

To be entitled to a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.[6]  We have cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has "clearly carried the burden of persuasion" on all four requirements.[7]  Citing our opinion in Martinez v. Mathews, Delco maintains that a mandatory preliminary injunction that goes beyond the status quo is even more disfavored and "should not be issued unless the facts and law clearly favor the moving party."[8]  We fail to see the relevance of that proposition here, however, because the preliminary injunction granted by the district court does precisely that; it maintains the status quo by keeping in effect a contractual relationship that has existed between the parties for almost a quarter century.  The

---

[6] Canal Auth. v. Callaway, 489 F.2d. 567, 572 (5th Cir. 1974).

[7] Mississippi Power & Light Co., 760 F.2d at 621.

[8] 544 F.2d 1233, 1243 (5th Cir. 1976)(citations omitted).

8

court merely commanded Delco to maintain the status quo by refraining from terminating the Parts Agreement.[9]

## C.    **Likelihood of Success on the Merits**

The principal thrust of LCD's merits claim is that Delco's 30-day, no-cause letter, ostensibly notifying LCD of the termination of the Parts Agreement, was ineffectual as a matter of law. The legal syllogism that is the gravamen of LCD's appeal goes: (1) The choice-of-law provision of the Parts Agreement subjects that contract to the substantive law of Michigan unless a provision of the contract contravenes the law of Louisiana, being the state where the agreement is to be performed; (2) the termination provision of the Repurchase Act, which is the performance forum's suppletive law affecting every dealership contract to which it applies, is contravened by the termination provision of the Parts Agreement; ergo, (3) Delco's use of the termination provision of the Parts Agreement was ineffectual, leaving the Parts Agreement in full force and effect.

On appeal, Delco counters, as it did in the district court, that the Repurchase Act —— specifically, its termination provision —— is different from, but is not contravened by, the termination provision of the Parts Agreement, so that the contractual

---

[9] The parties voluntarily continued to operate under the Parts Agreement during the pendency of this litigation.

termination provision remains in effect. Delco continues by urging that, even if this were not so, the law of Louisiana that the termination provision of the Parts Agreement is purported to contravene — the Repurchase Act — is not applicable to that contract.

We shall assume for the sake of argument that the differences between that contract's termination provision and the termination provision of the Repurchase Act are sufficient to trigger the contravention exception of the Parts Agreement's choice-of-law stipulation,[10] and proceed directly to test the Parts Agreement against the requirements of the Repurchase Act to determine whether that statute is even applicable to the Parts Agreement.

1. <u>Methodology</u>

Although appellate jurisdiction in this case rests on § 1292(A)(1) because we are reviewing the district court's grant of a preliminary injunction, federal jurisdiction rests on diversity of citizenship pursuant to § 1332(a). We therefore consider the

---

[10] <u>Paragraph G. Applicable Law</u>, of the General Provisions of Delco's 14-page standard form instrument, states:
> This Agreement is to be governed by and construed according to the laws of the state of Michigan, excluding any such laws which direct the application of laws of any other jurisdiction. <u>However, any provision which contravenes the laws of any state or jurisdiction where this Agreement is to be performed will be deemed not a part of this Agreement in such state or jurisdiction</u>. (emphasis added).

10

substantive law of Louisiana under the well-known standard of <u>Erie Railroad v. Tompkins</u>.[11]  As the propriety of the district court's grant of a preliminary injunction turns on the applicability of a particular Louisiana statute, our ultimate "<u>Erie</u> guess" requires that we employ the appropriate Louisiana methodology to decide this issue the way that we believe the Supreme Court of Louisiana would decide it.

The primary sources of law in Louisiana are constitutions, codes, and statutes; judicial decisions acquire the force of law only when their numerosity and uniformity are sufficient to achieve the status of <u>jurisprudence constante</u>.[12]  Here, we deal with neither constitutions nor codes, but with the Louisiana Revised Statutes. And, strangely enough, in this case we not only start with the governing statute, we end there:  Even though the Repurchase Act was added to the Revised Statutes more than a quarer century ago,[13] and even though the current version of the Repurchase Act is the product of a comprehensive revision enacted more than a decade ago,[14] we have been able to locate only a handful of cases that

---

[11] 304 U.S. 64 (1938).

[12] <u>See</u> Alvin B. Rubin, <u>Hazards of a Civilian Venturer in Federal Court:  Travel and Travail on the Erie Raliroad</u>, 48 La. L. Rev. 1369, 1372 (1988).

[13] 1975 La. Acts 283, at 626-29.

[14] 1991 La. Acts 627, at 2012-18.

construe this legislation, none of which affects the outcome of this appeal.[15]

    2.    <u>Overview of the Repurchase Act</u>

Title 51 of the Louisiana Revised Statutes addresses "Trade and Commerce," and Chapter 2 of that Title covers "Particular Goods." Part I-A of Chapter 2, entitled "Repurchase of Farm, Industrial and Lawn and Garden Equipment by Wholesaler," the Repurchase Act, is the 10-section Part on which this appeal turns. A brief overview of Part I-A reveals the framework within which we must determine whether the Repurchase Act applies to the Parts Agreement.

---

[15] <u>See</u> <u>Cherokee Pump & Equip., Inc. v. Aurora Pump</u>, 38 F.3d 246, 252-53 (5th Cir. 1994)(finding that the Repurchase Act does not constitute public policy and therefore does not override the contractual choice-of-law provision at issue); <u>Delta Truck & Tractor, Inc. v. J.I. Case Co.</u>, 975 F.2d 1192 (5th Cir. 1992)(indirectly referring to Repurchase Act in discussing whether farm implement dealership contract was breached);<u>John Deere Co. v. Slidell Tractor Co., Inc.</u>, Civ. A. No. 89-1953, 1992 WL 245609, at *12 (E.D.La. Sept. 15, 1992)(adjudicating the terms and timing of inventory repurchase under the Repurchase Act, not whether or not the law applies); <u>John Deere Co. v. Slidell Tractor Co., Inc.</u>, Civ. A. No. 89-1953, 1995 WL 758933 (E.D.La. Dec. 20, 1995)(similarly inapposite); <u>Int'l Harvester Credit Corp. v. Seale</u>, 518 So. 2d 1039, 1041-42 (La. 1988)(discussing overall purpose of the Repurchase Act and in particular explicating its damages provisions); <u>Echo, Inc. v. Power Equip. Distrib., Inc.</u>, 719 So. 2d 79, 91 (La. Ct. 1 App.)(finding that because Power was in default of its obligations under the collateral chattel mortgages, the notice and right to cure provisions of the Repurchase Act were inapplicable); <u>writ</u> <u>denied</u>, 729 So. 2d 555 (La. 1998).

The title of the Repurchase Act presages a statutory mandate requiring that a "wholesaler" (expanded in the statute to include manufacturers and distributors as well) to "repurchase," i.e., buy back, "equipment" that it previously transferred to its vendee. Although the title refers only to farm, industrial and lawn and garden equipment, the list of covered industries is expanded in the statute to comprise "farm, construction, heavy industrial material handling, utility and lawn and garden" equipment.[16] Likewise, the term "equipment" in the title of the Repurchase Act is expanded in the body of the statute to comprise "equipment, engines, implements, machinery, attachments and repair parts for such equipment."[17] Both statutory lists are finite rather than illustrative.

Section 481, the initial section of Part I-A, serves two functions. It describes the kind of conventional obligation to which the Part applies, and it defines a few particular terms as they are used in the statute. The remaining nine sections of Part I-A lay out the substance of the Repurchase Act and together reflect its nature, purpose, and function. In broadest terms, the substantive sections of the Repurchase Act embody the Louisiana Legislature's determination to protect resident sellers,

---

[16] La. Rev. Stat. Ann. § 51:481 (West 2003).

[17] Id.

13

distributors, and retailers (defined by the statute and hereafter referred to as "Dealers"[18]) who contract with wholesalers, manufacturers, or distributors (defined by the statute and hereafter referred to as "Agents"[19]) from two potential economic risks that the Legislature perceived as likely to result from the superior bargaining power of the Agents.  First, Dealers are protected from arbitrary and precipitous termination or cancellation of dealership relationships without being furnished adequate advance notice that specifies good cause and gives the Dealer an opportunity to cure the cause.  Second, former Dealers are protected from being left holding large inventories of equipment or spare parts, or both, with no choice but to incur substantial economic losses by "fire-sale" dispositions of such assets.[20]

The Legislature's solution to the risk of precipitous termination was to prohibit Agents from terminating, canceling, failing to renew, or substantially changing the competitive circumstances of such dealership agreements "without good cause."[21]

---

[18] La. Rev. Stat. Ann. § 51:481.B.(3).

[19] La. Rev. Stat. Ann. § 51:481.B.(4).

[20] Int'l Harvester Credit Corp., 518 SO. 2d at 1041 ("The legislation is designed to protect the dealer in the event the contract is terminated, for whatever reason, by requiring the manufacturer to repurchase the dealer's unsold inventory.")

[21] La. Rev. Stat. Ann. § 51:482.A.(1).

The Legislature first defined "good cause" in general terms of failure to comply substantially with essential and reasonable requirements of the dealership contracts,[22] and identified nine particular situations that constitute good cause.[23]  It then provided pre-termination protection for the local Dealer by (1) requiring the Agent to provide "at least ninety days' written notice of termination, cancellation, or nonrenewal of the dealership agreement," and (2) specifying the mandatory contents of such notices, including cure provisions.[24]

To complement the pre-termination protection afforded by the tightened notice requirement, the Legislature gave post-termination protection to local Dealers by providing a source for disposing of their leftover inventories of the Agent's equipment or parts, or both.  Section 484 requires the Agent to buy back the terminated Dealer's inventory of all new and unused "complete" engines, implements, equipment, machinery, and attachments that the Dealer tenders to the Agent, at a price determined by a formula contained in that section.[25]  Similarly, § 485 requires the Agent to buy back the terminated Dealer's inventory of the Agent's "repair parts" at

---

[22] La. Rev. Stat. Ann. § 51:482.A.(2).

[23] La. Rev. Stat. Ann. § 51:482.B.(1-9).

[24] La. Rev. Stat. Ann. § 51:482.C.

[25] La. Rev. Stat. Ann. § 51:484.

15

a price determined by a slightly different formula.[26] Sections 484 and 485 both state that they are not binding on the Dealer, who is free to keep the inventory or dispose of it in some other manner.[27] The final five sections of Part I-A — §§ 486-490 — supply a number of details, such as passage of title, right of possession, supplementary nature of the provisions, repurchase from heirs on death of a Dealer, liability for failure to repurchase, and reimbursement for handling costs.[28]

The perspective of the Repurchase Act that emerges from a comprehensive reading of the statute as a whole is one of statutory protection for the benefit of Louisiana Dealers in (1) specified kinds of equipment (2) for use in one or more identified industries. This is accomplished first by prohibiting short-notice, at-will termination of dealership contracts by Agents and, second, by ensuring that, if dealerships are terminated, the Dealers are not left "holding a bag" of equipment or repair parts, or both, without a ready source of liquidation at a fair price. With this framework firmly established, we proceed to parse § 481.A, the applicability provision of the Repurchase Act.

_____

[26] La. Rev. Stat. Ann. § 51:485.

[27] Although not expressed, it appears that a Dealer could accept a termination other than for good cause and with or without ninety days notice and an opportunity to cure; that is, a non-complying termination by an Agent is voidable, not void.

[28] La. Rev. Stat. Ann. §§ 51:486-90.

3.    Section 481.A:  Prerequisites to Applicability

Section 481 is entitled "Applicability of Part," referring to Part I-A of Title 51 of Louisiana's Revised Statutes, the Repurchase Act.  As subsection B. of § 481 is entirely definitional, the task of describing and delimiting the kinds of contractual relationships to which the Repurchase Act applies is left entirely to subsection A. — in fact, entirely to the first sentence of subsection A.

For reasons known only to the drafters of this legislation, _every_ delimiting feature of the types of contracts and agreements to which the Repurchase Act applies is contained in this one, 91-word, 14-comma, seemingly interminable, sentence.  Nevertheless, when a tediously exhaustive parsing of this serpentine sentence is performed within the framework established by the substantive provisions of the Repurchase Act, there emerges an unambiguous catalog of every feature that a contract must have if the Repurchase Act is to apply.  In all its Gordian glory, the applicability sentence of the Repurchase Act reads as follows (with emphasis added to highlight the particular features that the Parts Agreement must possess):

§ 481. Applicability of Part

A.  The provisions of this Part shall apply to _written contracts_ or oral agreements _of_ definite or _indefinite duration between_ [a.] _any_ person, firm or _corporation_

17

engaged in the business of selling, distributing or retailing [1] farm, [2] construction, [3] heavy industrial material handling, [4] utility and [5] lawn and garden [i] equipment, [ii] engines, [iii] implements, [iv] machinery, [v] attachments and repair parts for such equipment and [b.] any wholesaler, manufacturer or distributor of such equipment and repair parts, whereby the retailer agrees with the wholesaler, manufacturer or distributor to maintain a stock of such [x] parts, or [y] complete equipment or machines, or [z] attachments.[29]

Thus, for the Repurchase Act to be applicable to a dealership arrangement, the following features must be present:

- There must be a **contract** or **agreement** (although it can be either written or oral, and can be for either a definite or indefinite duration).

- The contract or agreement must **between a**

    1. "**Dealer,**" as defined in § 481B(3); and an
    2. "**Agent,**" as defined in § 481B(4).

- The **Dealer** must be in the **business** of selling, distributing or retailing.

- The **Agent** must be in the **business** of wholesaling, manufacturing, or distributing.

- The tangible movable (personal) **property** that the Dealer agrees to sell, distribute or retail and that the Agent agrees to wholesale, manufacture or distribute, must pertain to one or more of five industries only:

    1. farming
    2. construction
    3. heavy industrial material handling
    4. utility
    5. lawn and garden

- The tangible movables that are the objects of the dealership contract must be of one or more of the following types:

---

[29] La. Rev. Stat. Ann. § 51:481.A (emphasis added).

18

1. equipment
2. engines
3. implements
4. machinery
5. attachments

- In addition to the type or types of equipment that are the objects of the dealership contract, the Dealer must also agree to sell, distribute or retail, and the Agent must also agree to wholesale, manufacture or distribute,

  1. **repair parts**
  2. **for such equipment**.

- **And**, in the dealership contract, the Dealer also must agree to **maintain a stock [inventory]** of one or more of the following:

  1. repair parts for the subject tangible movables, **or**
  2. the tangible movables themselves, **or**
  3. attachments[30]

---

[30] A cursory reading of the subject sentence appears to reveal a slight ambiguity as a result of the punctuation of the phrase "equipment, engines, implements, machinery, attachments and repair parts...."  Because there is neither an "and" nor an "or" between the words "machinery" and "attachments" and no comma between the words "attachments" and "and," it is not absolutely clear whether "attachments" (whatever that term might mean here) is (1) a fifth category of basic tangible movables ("equipment, engines, implements, machinery, attachments") or (2) merely an ancillary tangible movable ("attachments and repair parts").  The final phrase in the first sentence of § 481A —— "parts, or complete equipment and machines, or attachments" —— seems to separate attachments from major pieces of equipment, but also to separate attachments from parts as well; and never even mentions engines or implements, two categories of movables that appear in the initial list of the kinds of movables that must be covered by contracts or agreements to which the Repurchase Act applies.  This putative ambiguity, evanesces, however, when read in context with § 484, which creates the Agent's obligation to repurchase new unused "engines, implements, equipment, machinery, and attachments (emphasis added), and § 485, which creates the parallel obligation for repurchase of "repair parts" only.  Fortunately, it is not necessary to resolve this ambiguity to decide the instant appeal.

19

Reduced to its essentials, the first sentence of § 481.A requires a contract to have two key characteristics if the Repurchase Act is to be applicable: (1) The contract must establish a dealership that sells, distributes or retails the kind or kinds of (a) equipment and (b) repair parts that are identified in that sentence; and (2) in the contract, the Dealer must agree to maintain an inventory of (a) such equipment or (b) such parts, or (c) both.

The Parts Agreement obviously contains a number of the features required by the first sentence of § 481.A.: It is a written contract; it is of indefinite duration; it is between a Dealer and an Agent; its objects are tangible movables (specifically, 53 product lines of automotive parts); and the Dealer agrees to maintain a stock of repair parts. The remaining prerequisites to applicability of the Repurchase Act, however, are problematical.

In the Parts Agreement, LCD as the Dealer and Delco as the Agent do not agree that Delco will supply and LCD will sell, distribute or retail any "equipment, engines, implements, machinery, attachments" whatsoever. Yet § 481A only applies to contracts under which the Agent supplies and the Dealer sells, distributes or retails both (1) one or more categories of "such equipment" (listed types of tangible movables for use in listed

industries) "_and_" (2) "repair parts _for such equipment_."  True, in the Parts Agreement, LCD agrees "to maintain a stock of such parts"; however, that requirement in the statute presupposes that the Dealer is agreeing to sell, distribute or retail not just repair parts, but one or more categories of tangible movables that the Repurchase Act subsequently refers to globally as "equipment." The Repurchase Act literally requires that, for a dealership contract to be covered by the statute, the Dealer must commit to sell the Agent's "equipment..._and_ repair parts _for_ _such_ equipment." In sum, § 481.A. cannot be read to make the Repurchase Act applicable to a contract that establishes only a freestanding dealership in repair parts.

We acknowledge that the Repurchase Act could be applicable to a dealership contract in which the Dealer in equipment manufactured or wholesaled by the Agent _does not_ agree to "maintain a stock" of complete equipment or machines or attachments (presumably selling equipment on special order only and not maintaining a "showroom" inventory of equipment), but _does_ agree to "maintain a stock" —— keep an inventory —— of repair parts for such equipment.  Crucial to understanding the distinction between this hypothetical arrangement and the Delco-LCD arrangement, however, is the recognition that the term "such parts" refers to "repair parts _for_ _such_ _equipment_"; and, in turn, that the term "such equipment"

21

comprises exclusively, and is limited to, the kinds of tangible movables ("equipment, engines, implements, machinery, attachments") that appear in the statute's exclusive list <u>and</u> are (1) wholesaled, manufactured or distributed by the Agent and (2) sold, distributed or retailed by the Dealer.  In other words, if the dealership contract commits the Dealer to deal in <u>both</u> equipment <u>and</u> parts for that equipment, the Dealer need not keep an inventory of the equipment as long as he keeps an inventory of parts.  But the obverse is not true:  keeping a parts inventory without being a dealer in the equipment itself is not sufficient to make the Repurchase Act apply.

Albeit not without considerable effort, the picture finally comes into crisp focus:  The Repurchase Act can apply to a situation in which the "stock," i.e., the inventory, that the Dealer "agrees to maintain" is <u>repair parts only</u>; but only if those repair parts are for <u>equipment</u> of the Agent that the Dealer, in the self-same contract, agrees to sell, distribute, or retail.  For example, if LCD contracted with John Deere to sell, distribute or retail —— but not maintain a stock (inventory) of —— large and expensive farm machines; and LCD further agreed to "maintain a stock of" "repair parts for such equipment," i.e., replacement and repair parts for the farm machinery, the Repurchase Act could be applicable.  This is because the hypothetical dealership agreement

22

that requires the dealer to (1) sell but not stock the equipment, but (2) maintain an inventory of repair parts for such equipment, fits within the plain wording of the statute (and is commercially realistic as well).  Not so, however, for a Dealer that, without contracting to sell, distribute or retail any of the Agent's underlying equipment, only contracts to "maintain a stock" of the Agent's repair parts.

As LCD has not contracted with Delco to sell, distribute or retail any equipment, engines, or machinery that Delco (or any GM division) wholesales, manufactures, or distributes, but has only contracted to maintain a freestanding stock of generic "vehicle replacement parts," the Repurchase Act does not apply to the Parts Agreement.[31]  Louisiana protects specified categories of Dealers in specified categories of new equipment <u>and</u> new spare parts for the equipment against the risks of precipitous terminations of dealership contracts, <u>provided</u> that the Dealer also maintains an inventory of the equipment or the parts, or both.  In contrast,

_____

[31] Indeed, if the Repurchase Act were applicable to Dealers who maintain a stock of an Agent's repair or replacement parts for equipment (including vehicles), engines, implements, machinery or attachments, without contracting with that Agent to sell, distribute or retail any of the Agent's equipment for which the repair parts are intended, the Repurchase Act would, at least potentially, apply to virtually every NAPA store, Auto Rally, PepBoys, Western Auto, Autolec, Sears or Penney's TBA Shop, as well as Home Depot, Wal-Mart, Ace Hardware, and so on <u>ad infinitum</u>.  That is clearly not what the Legislature intended and not what the Repurchase Act says.

Louisiana has not demonstrated an intention to protect dealers like LCD that stock and sell or distribute generic repair parts only. The fact that a free-standing parts dealer like LCD might be an equipment dealer for some unrelated — or even competitive — Agent is irrelevant.

In summary, as the Repurchase Act does not apply to the free-standing, parts-only Parts Agreement between LCD and Delco, LCD is not entitled to the protection of the Repurchase Act.  It follows inescapably, therefore, that the termination provision of the Parts Agreement, with its requirement of no more than a 30-day, no-cause written notice, does not contravene any law of Louisiana that is applicable to that agreement.  LCD does not contend that Delco's hand-delivered 30-day termination notice failed to comply with either the notice or the termination provisions of the Parts Agreement — indeed, Delco appears to have complied with those provisions to the letter — so LCD has no real likelihood of prevailing on the merits of its claim of invalid termination of the Parts Agreement.  As alone, the absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law, we need not address the three remaining prongs of the test for granting preliminary injunctions.[32]

---

[32] Similarly, as we have determined the Repurchase Act to be inapplicable to free-standing, parts-only agreements between

24

III.   CONCLUSION

The district court based its grant of LCD's motion for a preliminary injunction barring Delco's termination of the Parts Agreement on, <u>inter</u> <u>alia</u>, the conclusion that LCD had a substantial likelihood of success on the merits.  To reach that conclusion, the court had to determine that the Repurchase Act applies to the Parts Agreement.  In combination, our review of the essentially undisputed facts, our reading of the Parts Agreement, and our construction of the Repurchase Act, satisfy us that the statute is not applicable to the Parts Agreement (and, other than the inapplicable Marine Act, LCD has proffered no other Louisiana law that is contravened by the notice and termination provisions of the Parts Agreement).  Aware of nothing else in fact or in law that would invalidate Delco's termination of the Parts Agreement, we are convinced that LCD has no real likelihood of success on the merits

Agents and Dealers that do not also sell, distribute, or retail the Agents' underlying equipment, engines, implements, machinery, etc., we need not and therefore do not answer the question whether the Repurchase Act would also be inapplicable because of LCD's alleged failure to meet the "industries" requirement of the first sentence of § 481.A, i.e., that its "vehicle replacement parts" be sold, distributed or retailed in one or more of the five industries listed in that subsection.  We cannot help but observe, however, that inasmuch as § 481.B.(1) makes the Repurchase Act inapplicable to "vehicles" unless they are designed or adapted and "used exclusively" for operations in one or more of the five applicable industries, stand-alone dealership contracts for replacement parts for vehicles surely could not come under the aegis of the Repurchase Act unless the vehicles for which those parts are intended are themselves used exclusively in one or more of the targeted industries.

of its claim that Delco did not effectively terminate the Parts Agreement.

As the four prongs of the test for granting a preliminary injunction are conjunctive, LCD's failure of the likelihood-of-success prong is fatal to its claim for such relief.[33] We therefore reverse the district court's grant of a preliminary injunction prohibiting Delco from terminating the Parts Agreement and remand this case with instructions to vacate the preliminary injunction and to conduct any further proceedings in a manner that is consistent with this opinion.

REVERSED and REMANDED WITH INSTRUCTIONS.

---

[33] As LCD's breach of contract claim is not before us in this appeal from the grant of the preliminary injunction, we do not address that claim.